# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES, | ) |
| | ) |
| v. | )     Case No. 1:21-cr-647 |
| | ) |
| BURLEW | ) |
| _____ | ) |

## DECLARATION OF ATTORNEY WENDY OLSON

Pursuant to 28 U.S.C. § 1746, I, Brandy Bowen, hereby declares as follows:

    1.    My name is Wendy Olson.

    2.    I am a legal nurse consultant.

    3.    My CV is attached to this declaration as Exhibit A.

    4.    I have been retained by Benjamen Burlew to review his records and give a recommendation to the court based on my review as to whether he should be released.

    5.    I had a chance to review documents from his medical file and about his service history. These documents are attached to this declaration as Exhibits.

    6.    I also had a chance to conduct an interview via zoom with Mr. Burlew from the D.C. prison.

    7.    In my opinion, for the reasons set forth in my Report attached as Exhibit B, Mr. Burlew should be released immediately.

    8.    He is severely disabled and the conditions of confinement are horrific, especially for someone with his disabilities.

    9.    No accommodations have been made for his disabilities.

    10.    I am prepared to testify if necessary at a hearing on this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 31, 2024

/s/ Wendy Olson

Wendy Olson

# EXHIBIT A

Wendy K. Olson RN, MSN-MA

# WENDY OLSON RN, MSN-MA
WENDYOLSONMSN@GMAIL.COM
(251) 225-1390

**SUMMARY**

Nurse Executive Leader, Bioethicist, Educator, Published Writer, Accomplished Speaker, and Legal Nurse Consultant with comprehensive healthcare expertise in Hospitalizations, Home Health, Hospice, Quality and Risk Management, State/Accreditation Surveys, Department of Labor, C-Suite, Utilization Review and Process Improvements.  Extensive experience working with Medicaid, Medicare, VA, Department of Labor billing and diagnostic coding (ICD10).

**EXPERIENCE**

**Legal Nurse Consultant**

- Toxic Tort
- Environmental Chemical Exposures
- Medical Malpractice
- Product Liability
- Personal Injury
- Chart Review, Chronology, Interpretation of Medical Documentation and Summarization
- Case Analysis
- Screen and Review Case for Merit
- Assess alleged damages and/or injuries.
- Expert Witness/Expert Witness Fact Finder
- Prepare Depositions and Summaries

**Legacy Hospice, Jackson, Alabama**
**Director-** Oversight of 2 Hospice Branches covering 8 counties**.** Responsibilities include regulatory compliance related to Medicare/Medicaid. Oversight of all interdisciplinary team members, and in-home care for patients at end of life.

**Samaritan Healthcare, Moses Lake, Washington**
**House Supervisor (Contract)**- Responsible for collecting and analyzing data on patient admissions, transfers, and bed availability in specified clinical areas to improve patient care and maximize bed utilization. Ensured the patient was admitted to the most appropriate admission level of care using criteria for admission and functioned as a liaison for all integral stakeholders ensuring efficient operations. In the absence of the Chief of Patient Care Services, I served as the Administrator on Duty.

**Amedisys Hospice, Alabama**
**Director of Hospice Operations** – Responsibilities included regulatory compliance related to Medicare/Medicaid and **CHAP accreditations**, oversight of all interdisciplinary team members, and in-home care for patients at end of life.

Wendy K. Olson RN, MSN-MA

**University of Alaska and Norton Sound Health Corporation**
**Adjunct Professor and Clinical Educator for Medical – Surgical Unit** – Worked in conjunction with both the University of Alaska (Anchorage) and Norton Sound Health Corporation to successfully implement, teach, and oversee the RN program. This included didactics, hospital clinical, and simulation lab.

**Nuclear Care Partners, Washington State**
**Nurse Executive Director** – My role as Executive Director was to find energy workers who, because of exposure to workplace toxins, face a variety of debilitating medical conditions that include Radiogenic Cancer and Chronic Beryllium Disease. In collaboration with the client's physician, I performed complete physical assessments, obtained patients' medical records, and summarized all information to show the effects of prolonged toxic exposures on the human body. These reports were given to the Department of Labor for review to show that the client met eligibility for benefits under the Employee Occupational Illness Compensation Program Act (EEOICPA). I was honored with the company's Be the Difference Award.

**Ferry County Hospital, Washington**
**Chief Nurse Officer** – Critical Care Access Hospital. Contract as "Intern-CNO" to prepare hospital for **State Survey**. Mentor and support hospital administrators, nurse directors, nurse managers, and support staff. Ensure best practice among all nursing department leaders. Participate in forecasting trends, communicating ideas, and initiating procedures to ensure that best evidence-based practices are upheld.

**Norwalk Hospital Connecticut**
**House Supervisor** – Contract as House Supervisor at **366 bed** Yale teaching hospital.  Oversaw, guided, and mentored the nursing staff to ensure the plan of care for the patients was being followed. Effectively managed resources during assigned shift. Created a healthy work atmosphere that promoted both team and individual growth. Constantly monitored the workplace to ensure that all company policies and procedures were being maintained. Served as a clinical resource to the staff and patients/families. Worked cooperatively as an ancillary interdisciplinary team member to identify and solve patient-specific and facility-wide needs while improving operations.

**The Goodman Group**
**Executive Nurse Director of Home Health** (16 Counties) – Responsibilities included the overall day-to-day financial and clinical operations of a 16-county licensed Community Home Health. Accreditation Partner (**CHAP**).

**Regional Care Capella Healthcare**
**Director of Home Health** (10 Counties) – Responsibilities included regulatory compliance related to Medicare/Medicaid and to prepare Home Health service line for **Joint Commission re accreditation**. Maintained oversight of all interdisciplinary team members, and in-home patient care.

**Kittitas Home Health and Hospice**
**Director of Home Health and Hospice** – Contracted by healthcare organization to reduce 40% Medicare audit, establish employee stability, create, and implement processes to improve patient care, ensure timely submission of clinician paperwork and reimbursement, reduce billable days outstanding, and obtain nearly $1 million in outstanding billing. After 6 months, clinical submission of paperwork went from 30 days to 24 hours, outstanding billing days declined from 280 days to 22 days, $868,000 was recovered, and the department saw a reduction in its Medicare Audit.

Wendy K. Olson RN, MSN-MA

### Mission Hospital – 1,000-bed/Level 2 Trauma Center
**Administrative Nursing Supervisor** – Supervised, directed, and delivered nursing care. Provided clinical and management assistance to all staff members and worked with support services, physicians, and staff members to ensure quality patient care. Prioritized hospital demands to ensure patient needs were met. Established effective interpersonal relations with all members of the hospital staff. Monitored the use of resources to provide cost-effective care.

### Med West Hospital – 200+-bed
**Administrative Nursing Supervisor** – Oversaw development and implementation of plans for directing and supervising nursing services in the care and treatment of patients. Reviewed and revised current nursing policies and procedures to improve quantity and quality of services provided. Promoted communication among families, patients, hospital departments, and medical staff to optimize interdependence of all team members. Coordinated needs of physicians and mediated between nursing staff and medical staff.

### Bayada Home Health
**Director of Clinical Services** (7 Counties) – Recruited to stabilize and grow a new branch specializing in home health and hospice care involving Medicaid, VA, and self-pay. Provided clinical oversight, coaching, and mentoring to field staff. Collaborated with team members regarding client status, care plans, and expected outcomes. **CHAP Accreditation** preparedness.

### Big Bend Hospice
**Quality Assurance – Performance Improvement Clinical Educator/Case Management** (500+ 12-room hospice house) – Collaborated with clinical teams to identify clinical educational needs. Coordinated education programs for staff and community. Facilitated in-house education for interdisciplinary teams.

### Gentiva Home Health
**Case Manager/Preceptor** – Trained new RNs and LPNs on providing standard of care within patients' homes, including OASIS training. Partnered with physicians, IDT members, patients, and family to ensure patients' plans of care were followed. Performed field supervisory visits.

### Archbold Regional Medical
**OR- Medical Surgical- Outpatient Surgery- Dialysis**

### Ohio State University Medical Center
**Surgical Technologist** – Scrubbed in and assisted physicians during surgery.

## EDUCATION

**Master's Degree in Bioethics and Healthcare Policy**, Loyola University                 January 2019

**Master of Science in Nursing**, Western Governors University                 August 2015

**Bachelor's Degree in Nursing**, Western Governors University                 February 2014

**Associates of Science in Nursing**, Central Ohio Technical College                 June 2006

**Surgical Technology**, Central Ohio Technical College                 December 2003

**ACLS, BLS, PALS**                 current

**Compact RN Licensure**                 current

Wendy K. Olson RN, MSN-MA

**SPEAKING ENGAGEMENTS & PUBLICATIONS**

- 2019 American Nurses Association Annual Ethics in Nursing Conference. Co-Author Abstract "Neutrality in Nursing at End of Life"
- Guest speaker for Visiting Nurses Association of America, "Nurses' Perspective on Medical Aid in Dying"
- "My Hospice Story," Heartlinks Hospice
- "My Hospice Story," Hospice Action Network
- "Refusing Nourishment at End of Life," various medical organizations
- "Death and Dying, POLST, and Advanced Directives," various organizations
- Special guest panelist on Hospice and Palliative Care, Virginia Mason Medical Center
- Special guest speaker on End of Life at Florida State University
- "We Need Truth in Treatment in Modern Medicine" – Publication picked up by the following outlets:
- Caribbean Life (Brooklyn, NY), Clarion Ledger (Jackson, Mississippi), Daily Express (Newport, Vermont), Houston Chronicle, Lock Haven Express (PA), Monroe News (Michigan), The Mountain Mail (Salida, CO), North Texas eNews, and Poteau Oklahoma Daily News & Sun

**LEGISLATIVE ACTIVITY**

Senate Committee Testifier, Death with Dignity Bill, Iowa State Capitol
Hospice Initiatives
Patient Advocate Washinton DC

# EXHIBIT B

Client: Benjamen Burlew
DOB: September 8, 1979
Release Recommendation Request


July 29, 2024

**REPORT RECOMMENDING RELEASE FOR BENJAMEN BURLEW BASED ON REVIEW OF MEDICAL RECORDS**

The following recommendation is based on a review of Mr. Burlew's medical records and interviews conducted with him and his spouse.

Mr. Burlew is a national citizen of the United States of America. He was born in El Paso, Texas and is the son of a United States Army Ranger Veteran. Following the military attack on the United States on September 11, 2001, Mr. Burlew enlisted in the United States Army and served on active duty from June 14, 2001 – February 5, 2009.  According to reviewed medical records from the Veterans Administration and Social Security Disability the physical injuries he sustained during combat combined with witnessing mass casualties and the sudden loss of fellow soldiers during combat has resulted in 100% disability with both government agencies.  Those diagnosis include but are not limited to:

SERVICE-CONNECTED INJURIES:

M54.12 Cervical radiculopathy (SCT 54404000)

S06. Traumatic Brain Injury

M25.572 Pain of left ankle joint (SCT 15916891000119103) (shattered ankle)

R41.840 Unable to concentrate (SCT 60032008)

G47.33 Sleep apnea (SCT 73430006)

M54.30 Sciatica (SCT 23056005)

F43.12 Chronic post-traumatic stress disorder following military combat (SCT  699241002)

F33.1 Moderate recurrent major depression (SCT 18818009)

Following Mr. Burlew's honorable discharge from the military, he returned to the United States where he established stable employment and a family. His previous marriages resulted in having two sons Noah who are now age 22 and Greyson who is now 12 years of age. His marriages ended in divorce and in 2019 he remarried Brandy Burlew who he had known since high school. Brandy was a widow with three children Ema (12), CJ (8), and Anna (14). All five children refer to Ben as their father and he has been an active and supportive role in each of their lives. Brandy and her three children were traumatized after losing her husband and her children's biological dad to death. Now Brandy and her children along with Ben's biological children are going through the trauma of being separated from her husband and their father.

Client: Benjamen Burlew
DOB: September 8, 1979
Release Recommendation Request

Due to fear of drug and alcohol addiction, Mr. Burlew has chosen a homeopathic approach to managing his Post Traumatic Stress Syndrome (PTSD), Depression, Anxiety, and chronic pain related to injuries sustained during combat. His treatments include approved medical cannabis, chiropractic care, plant therapy, Bible study, cold/ hot water baths, therapeutic massager, Tens Unit specialized shoes which help to control his backpain, and prior to his arrest two of his dogs were being trained as service animals for emotional support and to wake him up during periods of apnea while sleeping. Note: Apnea is defined as a lapse in breathing which can result in death.

During my interview with Ben he stated, "after seeing vehicles blown up killing my friends and fellow soldiers, I can no longer drive.  The thought of driving and being in crowds causes flashbacks which becomes paralyzing. I must mentally prepare to leave my home and it must be structured. If anything changes, it results in increased anxiety, and I am unable to leave." His wife does the day to day activities (grocery shopping, etc..)

Since his incarceration Ben has been placed in solitary confinement, 72-hour lock downs, placed in prison cells covered in toilet water, rats, roaches, and mold.  Ben contracted malaria while in the military and with a lack of air conditioning, his body has difficulty regulating its temperature. Following his years in combat, he is hypertensive to loud noise.  Ben is currently held in a prison cell where he is exposed to loud construction sounds causing exacerbation of his PTSD.  He compares the loud noise to explosions he experienced while in combat. Ben stated, "when I hear loud noises, I drop to the floor in fear of dying."

Ben has received no prior, pre-approved medical treatment since his incarceration which leaves him physically and mentally vulnerable to the exacerbation of his medical diagnosis' he incurred while serving multiple tours of duty. Based on my professional experience providing care to veterans who suffer from combat related trauma; Ben's current environment is cruel and inhumane. Ben has a stable home environment and a supportive family. Ben is not a flight risk and should be released to his family where he can continue his medical care.

Wendy Olson RN, MSN-MA
Bioethicist- Legal Nurse Consultant

# EXHIBIT C

Benjamen Burlew
DOB: September 8, 1979
Medical Summary

Medical Summary

Staff SGT/E5 Benjamen Burlew enlisted in the United States Army and served on active duty during the Gulf War from June 14, 2001 – February 5, 2009. According to records obtained and reviewed from the Veterans Administration, during Mr. Burlew's service to the American military he has been in 500 firefights, over 500-gun shots at him, and blown up several times resulting in mass casualties along with the deaths of his friends. During a fire fight in the mountains of Afghanistan Mr. Burlew fell off a mountain resulting in a broken back.

**SERVICE-CONNECTED INJURIES:**

M54.12 Cervical radiculopathy (SCT 54404000)

S06. Traumatic Brain Injury

E78.5 Hyperlipidemia (SCT 55822004)

R73.9 Hyperglycemia (SCT 80394007)

M25.572 Pain of left ankle joint (SCT 15916891000119103) (shattered ankle)

R41.840 Unable to concentrate (SCT 60032008)

G47.33 Sleep apnea (SCT 73430006)

M54.30 Sciatica (SCT 23056005)

N39.0 Urinary tract infection (SCT 68566005)

F43.12 Chronic post-traumatic stress disorder following military combat (SCT  699241002)

F33.1 Moderate recurrent major depression (SCT 18818009)


Mr. Burlew with acknowledgment from the Veterans Administration's physician Dr. Christopher Taylor, and his chiropractor has chosen homeopathic treatments instead of pharmaceutical treatments following an adverse reaction. These treatment's  include pine bark and pine pollen for testosterone levels, medicinal mushrooms (approved medical marijuana), and nutropics for his traumatic brain injury. His chiropractor plays a huge role

Benjamen Burlew
DOB: September 8, 1979
Medical Summary

in ensuring his physical mobility, as well as holistic treatment for his Post Traumatic Stress Disorder.  During an interview conducted with Mr. Burlew's wife, Mrs. Burlew stated, " It's all documented in Ben's VA file that we do all natural treatments, and Ben also works with a chiropractor for his mobility. He does ice baths at home and utilizes medical cannabis which he was approved.  He has not needed any other form of treatment in 4 years."  Also, according to clients VA Medical Records, he has no criminal background, he stated he has" a strong religious belief" and does not meet suicide criteria. He is a present father to his four children aged 8 – 14 years of age.

According to Mr. Burlew, the correctional facility in which he is currently detained stated they are not appropriately equipped to provide the necessary medical treatment he requires. On behalf of Mr. Burlew and his family, I ask that he is remanded home where he can return to his prior medical treatment which to date has shown effective.

# EXHIBIT D

BENJAMEN BURLEW

3 of 5



## DEPARTMENT OF VETERANS AFFAIRS
### Veterans Benefits Administration
### Regional Office

### BENJAMEN BURLEW

### VA File Number

### Represented By:
### HARRY J BINDER
### Rating Decision
### 10/20/2022

## INTRODUCTION

The records reflect that you are a Veteran of the Gulf War Era. You served in the Army from June 14, 2001, to February 5, 2009. You filed a claim for increased evaluation that was received on March 2, 2022. Based on a review of the evidence listed below, we have made the following decision(s) on your claim.

## DECISION

 1. Entitlement to individual unemployability is granted effective January 20, 2021.

2. Basic eligibility to Dependents' Educational Assistance based on permanent and total disability status is established from January 20, 2021.

3. Evaluation of posttraumatic stress disorder, which is currently 70 percent disabling, is continued.

4. Evaluation of left ankle strain status post fracture, which is currently 10 percent disabling, is continued.



OIJPZ01200460300080011  081647



BENJAMEN BURLEW

3 of 5



Evidence we have used to grant permanent and total disability status: VA contract examination from QTC dated June 4, 2014; VA contract examinations from VES dated July 21, 2022, and August 17, 2022.

### 3. Evaluation of posttraumatic stress disorder currently evaluated as 70 percent disabling.

The evaluation of posttraumatic stress disorder is continued as 70 percent disabling.

We have assigned a 70 percent evaluation for your posttraumatic stress disorder based on:
• Anxiety
• Chronic sleep impairment
• Circumlocutory speech
• Circumstantial speech
• Depressed mood
• Difficulty in adapting to a worklike setting
• Difficulty in adapting to stressful circumstances
• Difficulty in adapting to work
• Difficulty in establishing and maintaining effective work and social relationships
• Disturbances of motivation and mood
• Forgetting directions
• Forgetting names
• Forgetting recent events
• Forgetting to complete tasks
• Impaired impulse control
• Impairment of short- and long-term memory
• Mild memory loss
• Near-continuous depression affecting the ability to function independently, appropriately and effectively
• Near-continuous panic affecting the ability to function independently, appropriately and effectively
• Obsessional rituals which interfere with routine activities
• Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood
• Panic attacks more than once a week
• Retention of only highly learned material
• Speech intermittently illogical
• Speech intermittently irrelevant
• Speech intermittently obscure
• Stereotyped speech
• Suspiciousness
• Unprovoked irritability with periods of violence

The overall evidentiary record shows that the severity of your disability most closely approximates the criteria for a 70 percent disability evaluation. (38 CFR 4.7, 38 CFR 4.126)

A higher evaluation of 100 percent is not warranted for a mental disorder unless the evidence



BENJAMEN BURLEW

BENJAMEN BURLEW

4 of 5

shows total occupational and social impairment, due to such symptoms as:
• Gross impairment in thought processes or communication
• Persistent delusions or hallucinations
• Grossly inappropriate behavior
• Persistent danger of hurting self or others
• Intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene)
• Disorientation to time or place
• Memory loss for names of close relatives, own occupation, or own name. (38 CFR 4.125, 38 CFR 4.126, 38 CFR 4.130)

### 4. Evaluation of left ankle strain status post fracture currently evaluated as 10 percent disabling.

The evaluation of left ankle strain status post fracture is continued as 10 percent disabling.

We have assigned a 10 percent evaluation for your left ankle strain status post fracture based on:
• Painful motion of the ankle (38 CFR §4.59 allows consideration of functional loss due to painful motion to be rated to at least the minimum compensable rating for a particular joint. Since you demonstrate painful motion of the ankle, the minimum compensable evaluation of 10 percent is assigned.)

Additional symptom(s) include:
• Slight limitation of motion of the ankle based on plantar flexion less than 45 degrees

The provisions of 38 CFR §4.40 and §4.45 concerning functional loss due to pain, fatigue, weakness, or lack of endurance, incoordination, and flare-ups, as cited in DeLuca v. Brown and Mitchell v. Shinseki, have been considered and applied under 38 CFR §4.59.

A higher evaluation of 20 percent is not warranted for limitation of motion of the ankle unless the evidence shows:
• Marked limitation of motion of the ankle based on dorsiflexion less than 5 degrees or plantar flexion less than 10 degrees. (38 CFR 4.71a)

### 5. Evaluation of tinnitus currently evaluated as 10 percent disabling.

The evaluation of tinnitus is continued as 10 percent disabling.

We have assigned a 10 percent evaluation for your tinnitus based on:
• Recurrent tinnitus

A single evaluation for recurrent tinnitus is assigned whether the sound is perceived in one ear, both ears, or in the head.

This is the highest schedular evaluation allowed under the law for tinnitus. (38 CFR 4.87)



BENJAMEN BURLEW

5 of 5

## REFERENCES:

Title 38 of the Code of Federal Regulations, Pensions, Bonuses and Veterans' Relief contains the regulations of the Department of Veterans Affairs which govern entitlement to all Veteran benefits. For additional information regarding applicable laws and regulations, please consult your local library, or visit us at our website, www.va.gov.

# EXHIBIT E

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

| IN THE CASE OF | CLAIM FOR |
|---|---|

<table>
<tr><td>Benjamen Scott Burlew<br>(Claimant)</td><td>Period of Disability and Disability Insurance<br>Benefits</td></tr>
<tr><td>(Wage Earner)</td><td>21G9055J70745<br>(Beneficiary Notice Control Number)<br><em>Social Security Number removed for your protection</em></td></tr>
</table>

## JURISDICTION AND PROCEDURAL HISTORY

This case is before the undersigned on a request for hearing dated October 27, 2022 (20 CFR 404.929 *et seq.*). On May 8, 2023, the undersigned held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic. All participants attended the hearing by telephone. The claimant agreed to appear by telephone before the hearing, by submitting the COVID-19 Remote Hearing Agreement Form, dated February 2, 2023, and he confirmed such agreement at the start of the hearing. The claimant is represented by Teresa Louise Click, a non-attorney representative. Angharad B. Young, Ed.D., an impartial vocational expert, also appeared and testified by telephone.

The claimant is alleging disability since October 31, 2019.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

1. **The claimant's date last insured is December 31, 2024.**

2. **The claimant has not engaged in substantial gainful activity since October 31, 2019, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).**

3. **The claimant has the following severe impairments: posttraumatic stress disorder; major depressive disorder; generalized anxiety disorder; hearing loss; degenerative disc disease; osteoarthritis; and obesity (20 CFR 404.1520(c)).**

4. **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

5. **The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). Specifically, he can stand and/or walk for a total of four hours in an**



eight hour day and sit about six hours in an eight hour workday; can occasionally climb
ladders, ropes, scaffolds, ramps, and stairs; occasionally stoop, kneel, and crawl; frequently
crouch; can work in an environment with no more than moderate noise intensity and can
have occasional exposure to vibrations as those terms are defined in the Dictionary of
Occupational Titles (DOT) and Selected Characteristics of Occupations (SCO). The
claimant can understand, remember, and carry out simple through detailed but not
complex instructions; can concentrate and persist in two-hour increments over the course
of an eight-hour workday; occasionally interact with supervisors; never interact with
coworkers or the public; and can deal with occasional changes in a routine work setting.

In making this finding, the undersigned has considered all symptoms and the extent to which
these symptoms can reasonably be accepted as consistent with the objective medical evidence
and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. The
undersigned also considered the medical opinion(s) and prior administrative medical finding(s)
in accordance with the requirements of 20 CFR 404.1520c.

The claimant has the following degree of limitation in the four broad areas of mental functioning
set out in the disability regulations for evaluating mental disorders and in the mental disorders
listings in 20 CFR, Part 404, Subpart P, Appendix 1: a "moderate" limitation in understanding,
remembering, or applying information; a "marked" limitation in interacting with others; a
"moderate" limitation in concentrating, persisting, or maintaining pace; and a "moderate"
limitation in adapting or managing oneself.

When the claimant completed his Function report on January 21, 2022, he stated he could not
work with other individuals because of his anxiety. He also reported issues with loud noises as
they "throw me back into war" (4E/1). He stated he could not go into public or to church without
having a panic attack and stated he did not sleep most nights. Regarding personal care, he stated
he often forgot whether he had bathed, when having an attack, and he reported going long
periods (when depressed) without shaving, trimming his hair, or eating (4E/2). He stated his wife
often reminded him to bathe, she laid out his medication for him daily (4E/3), and he stated he
needed reminders to go places (4E/5). He also stated he either needed his wife, kids, or his
service dog with him, if he went anywhere (4E/5). He denied meal preparation, stating his wife
prepared meals and made sure he ate because when he struggled, he did not always want to eat.
He reported performing some light chores, but stated he needed encouragement to engage in
those activities because he got depressed easily (4E/3).

While the claimant stated he went outside daily, he stated he could not go out alone, due to
having panic attacks in public, especially when around large crowds. He reported shopping by
phone, mail, and computer, for "survival supplies, MREs, and survival food". He stated his wife
paid the bills and managed their bank account because it stressed him out, but he stated he could
count change. Regarding money, he stated, "I only want to buy things that make me feel safe"
(4E/4). In addition, he stated he spent time with others by phone and Facetime, but did not go
anywhere on a regular basis, due to the severity of his posttraumatic stress disorder and social
anxiety. He reported issues getting along with family/friends/neighbors, with him stating he did
not talk to either of his parents or his siblings. He stated he had a couple of friends, but he
reported arguments with his neighbors (4E/5). He also stated he had good/bad days, stating



because of his issues that changed on a day-to-day basis. Regarding his ability to pay attention, he stated that depended on his posttraumatic stress disorder and he stated his ability to finish what he started "depends". He also stated he followed written instructions well, "when my mind is clear" and regarding spoken instructions, he stated it depended on his mental state that day. However, he stated he got along well with authority figures and stated he had never been fired or laid off because of inability to get along with others (4E/6). However, as discussed below, during testimony, he stated he had been terminated from his last employment due to altercations with others. Additionally, he stated his ability to handle stress or changes in routine was not good, as he panicked if something was off (4E/7). With respect to unusual behaviors or fears, he stated he wanted to build a fortress around his house so that he could block out people that much more (4E/7).

At the initial level, the claimant alleged chronic posttraumatic stress disorder from combat; bilateral hearing loss requiring hearing aids, constantly; sleep apnea; sciatica; broken/fractured back; hyperglycemia; hyperlipidemia; chronic pain in the ankle from being shattered in combat; and arthritis.

At the reconsideration level, he stated he had become more and more unable to function in public, stating he had even stopped attending church because of his anxiety and posttraumatic stress disorder, which had gotten worse. He also stated he would not go with his wife and kids anywhere, due to fear of having a panic attack. He reported being ok at home, in his safe environment but stated he was paranoid when in public and always on alert. He stated this was not fun for his wife and children, so he just stayed home most of the time so that he did not cause them stress. He also stated loud noises startled him, and large crowds made me terribly anxious to the point that he could not function. He further stated he did not want to get into public and not be able to escape the situation, so it was better if he stayed home. Additionally, he reported irritability when anxious and stated he could manage at his home, but that was about it.

At the hearing level, he stated he had been found to be totally and permanently disabled and unemployable by the Department of Veterans Affairs, due to his service-connected disabilities. This is supported by a letter from the Department of Veterans Affairs, dated January 19, 2023, showing service-connected compensation at the 100 percent rate, effective as of January 20, 2021 (11D).

The undersigned finds the claimant's allegations to be consistent with the other evidence. Records show that he was an Army Ranger and was diagnosed with chronic post-traumatic stress disorder following military combat. The claimant testified he was terminated from his last employment due to altercations with others, and he stated he no longer speaks to his family due to conflict. He also stated he lives on some property with his wife's family but does not interact with them.

Records from the Department of Veterans Affairs have indicated when seen on November 4, 2019, he presented reporting sleep issues and increased nightmares. He also stated his left ankle had been "locking up" and he was noted to have chronic history of ankle issues. Examination of the lumbar spine revealed tenderness to palpation, and straight leg raise lift-lower portion along the lumbar sacral spine. He was started on trazodone for sleep and was offered x-rays, physical



therapy, and podiatry referral for his ankle, but he declined at that time, stating he would follow-up as needed (1F/50/53-54).

A telephone encounter note dated August 17, 2020, indicated he reported back pain and increased social anxiety, flashbacks, and nightmares (1F/44).

When seen on November 6, 2020, he complained of back pain, joint pain and problems with sleep related to his posttraumatic stress disorder. Examination of the lumbar spine revealed tenderness with dramatic range of motion (DROM), straight leg lift positive bilaterally-lower portion along the lumbosacral spine. He also had decreased grip strength bilaterally. The assessment was hyperlipidemia, lumbar radiculopathy, cervical radiculopathy, and posttraumatic stress disorder. Updated x-rays were ordered to evaluate for lumbar fracture, and it was noted he continued to have numbness and weakness of the upper extremities, therefore, updated cervical x-rays were ordered and he was referred to community care physical therapy. It was also noted, despite medication mildly improving his posttraumatic stress disorder symptoms, an order was placed for community care consultation for mental health, for continued counseling for his chronic condition. He was prescribed bupropion for depression and methocarbamol for muscle spasms (1F/38-41).

X-rays of the lumbar spine performed on the above date, indicated vertebral body heights preserved with grade 1 anterolisthesis of L5, with facet arthropathy at L5-S1, right worse than left (1F/81). However, x-rays of the cervical spine were within normal limits (1F/80).

On March 26, 2021, he presented for follow-up of anxiety. Chronic conditions also included sleep apnea, sciatica, urinary tract infection, posttraumatic stress disorder, moderate depression, and inability to concentrate. Specifically, he reported an increase in nightmares and anxiety. He stated he had previously been on a program for his posttraumatic stress disorder, but it had been ineffective, and it was noted he was currently declining medication, stating he wanted to stay in the holistic medicine world and counseling (1F/24).

Additional records show that when seen for mental health intake on October 14, 2021, he reported trauma (deployed 7 times), in combat, with the loss of several friends in special operations, as well as sleep problems (only four hours per night), and anger and resentment issues over current conflicts with his ex-wife that had resulted in him not being able to see his 9-year-old son. Mental status examination indicated he was alert and oriented x 4, with eye contact appropriate, and hygiene presentable, but his mood was intense, with affect indicating mania/hypomania and his posture tense. Additionally, thought processes and content were questionable, with insight and judgment both fair (1F/77/79).

He was also seen by Ray L. Edwards, MHR, LPC, for consultative mental status examination on March 3, 2022, the claimant reported emotional and behavioral symptoms related to serious stress and stated he had been engaged in numerous campaigns during his time in the military. He also reported difficulties surrounding current legal troubles that were affecting his ability to see his child. He reported that each morning he had to lie on his living room floor for over 2 hours before he could function enough to move around. He reported specific issues with memory,



Benjamen Scott Burlew (BNC#: 21G9055J70745)                    Page 5 of 9

cognition, balance, sensory input overloads, and confusion. He also reported having very short mental endurance.

Regarding his posttraumatic stress disorder, he stated that in combat he lost friends during special operations, and he stated he had dreams that involved soldiers committing suicide, having to sweep cars for explosive devices, and debriefings. He described his symptoms as chronic and present for many years, with feelings of intense fear, helplessness, nightmares, flashbacks, feelings of detachment, and memory issues exclusive to the event. He also described a history of other trauma.

He reported prior outpatient treatment for his anger and depressive symptoms, but stated he quit after he became suspicious of the therapist. Additionally, he reported having issues with the government, stating he wanted to build a moat around his house to keep them away. He stated he could remain awake for up to three days per week, moving around constantly. He stated his depressive episodes occurred several times per month, lasting for days. He described his symptoms as, acting out, anger, concentration difficulties, fatigue, irritability, isolation, decreased libido, sadness, oppositional behavior, difficulty sleeping and decreased sociability.

He also stated panic attacks were triggered by riding in cars, crowds, restaurants, and having to leave his home and he stated they involved the acute onset of a discrete period of intense fear and discomfort, with symptoms of chest pain or discomfort, chills, dizziness, fear or dying, increased heart rate, shortness of breath and migraine headaches.

In addition, the claimant reported his back pain prevented him from standing/walking more than 15-20 minutes and the examiner noted when he presented, he ambulated with an abnormal gait and utilized a cane. At that time, he also reported he had been unable to take a shower for 2-3 days due to balance issues.

Mr. Edwards noted the claimant endorsed a range of psychiatric symptoms that included paranoia, oppositional defiance, anxiety, severe depression, irritability, significant sadness, guilt, problems with concentration, rapid mood swings and insomnia. He further noted the claimant exhibited a degree of emotional reactivity when discussing his children and the loss of several friends.

Upon examination, he was noted to be casually dressed, well-groomed and eye contact was adequate. He arrived 15 minutes early for the appointment and stated he drove himself to the examination. Upon approach, he appeared anxious, but was cooperative, polite, and well-mannered with mood elevated, and speech pressured, often rapid (overtalkative) (had to be redirected several times) with eye contact adequate, and his affect was incongruent with mood. Language skills were intact but motor skills were impaired. He denied suicidal/homicidal ideations and his thought processes were appropriate. Short and long-term memory were intact, as was his ability to abstract and do arithmetic calculations. He was also fully oriented, and his vocabulary and fund of knowledge indicated cognitive functioning in the normal range. However, insight into problems was fair, as well as judgment, and Mr. Edwards noted signs of anxiety and depression, with short attention span evident, as he was easily distracted.

Benjamen Scott Burlew (BNC#: 21G9055J70745)                    Page 6 of 9

In summary, Mr. Edwards noted the claimant's symptoms appeared to be internalized when he got frustrated and irritable. He also stated symptoms of fatigue and weakness were evident as well. He noted there had been numerous changes associated with a reaction to his stress as well as evidenced in his loss of interest in previously enjoyed activities. He also noted the claimant had socially withdrawn, isolated and felt helpless. The claimant also reported sensory perception, smells that were issues, and being overwhelmed with colors and tastes, which had become a severe problem. Mr. Edwards opined if the appropriate intervention was not implemented, the severity was estimated to be high, based on the risk of morbidity without treatment and description of interference with functioning (4F).

Records by Shawn Alyea, the claimant's counselor, have indicated when seen (via tele-health) on March 25, 2022, his mood was concerned but cooperative, and he actively engaged in the session, with affect anxious. He was oriented x 4, with thought processes logical and linked, but at times, he focused strongly on religious or political subjects (9F/1). Mental status was unchanged when seen on March 31, 2022 (9F/2).

On May 10, 2022, June 7, 2022, July 5, 2022, August 5, 2022, September 9, 2022, October 7, 2022, November 3, 2022, December 8, 2022, February 10, 2023, and March 10, 2023, mental status examinations were the same as noted above, except he also appeared to display hypervigilance and continued to focus strongly on religion (9F/4-11/13-14).

On September 9, 2022, they discussed possible referral to eye movement desensitization and reprocessing therapy (EMDR) but the claimant declined (9F/8).

On July 4, 2022, his counselor submitted a statement regarding the claimant's ability to function. She stated he did not appear to possess the traits necessary to be successful in the work environment at the current time, as she had not observed or heard reports that he possessed the coping skills necessary to interact with coworkers or authority figures holding different opinions from his own. She also noted he had not reported the ability to handle work environment pressures during their conversations (6F; duplicated at 9F/16).

The claimant was also seen by Jeffery Young, D.O., for consultative physical examination on August 27, 2022. He noted hearing was not grossly normal and was diminished bilaterally, with bilateral hearing aids in use. He had decreased range of motion of the cervical spine and lumbar spine, as well as bilateral shoulders, bilateral hips, and ankle/foot, with pain reported during left ankle range of motion testing. He also noted the claimant's gait was asymmetric, slow, antalgic, and limping on the right. The claimant presented with a walking cane, but he noted the claimant was able to walk around the examination without it but was limited by pain. Additionally, he had decreased sensation to light touch at the right upper extremity compared to the left, and straight leg raise was positive bilaterally at 30 degrees in the sitting and supine positions. There was also tenderness at the left ankle joint, but no joint swelling, effusion, erythema, or deformity. He was able to lift, carry and handle light objects. He further noted the claimant was able to squat and rise from that position with difficulty and was able to rise from a sitting position without assistance but had difficulty getting up and down from the examination table. He was unable to walk on heels or toes, tandem walking was not achieved, and he noted the claimant could not stand or hop on one foot bilaterally.



Following examination, Dr. Young noted the claimant had moderate limitations with sitting and severe limitations with standing and walking due to chronic pain. He stated the claimant did not need an assistive device with regard to short distances but did need one (non-prescription walking cane) for long distances and uneven terrain. He also stated the claimant had severe limitations with lifting and carrying weight due to chronic pain, as well as limitations with bending, stooping, crouching, and squatting, noting the claimant could perform those occasionally. Additionally, he noted limitations with reaching, grasping, handling, fingering, and feeling, stating the claimant could perform those frequently, due to chronic pain. He found no relevant visual or communicative limitations but stated there were relevant workplace environmental limitations due to chronic pain with limited mobility and mental health issues (7F).

Regarding his physical issues, when he completed his Function report on January 21, 2022, he stated he could not do very laborious tasks due to his physical impairments. He stated he could do light cleaning, laundry and "mild" yardwork depending on the day and his pain level. He reported problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and hearing (wears hearing aids-daily-since March 2021) and seeing. He also stated he used a cane, crutches, or walker, as needed (4E).

Following review of the evidence of record, the undersigned finds the combination of the claimant's impairments limits him to less than a full range of light, as noted in the above-stated residual functional capacity.

As for the opinion evidence, the undersigned has considered the Disability Determination Explanations (mental) of Ryan C. Jones, Ph.D., dated March 31, 2022, and William Farrell, Ph.D., dated July 19, 2022, who opined the claimant is able to understand, recall and perform simple and detailed tasks, but not complex tasks, and make occasional related judgments and attend to and complete more than basic tasks, including tasks that require some skills and judgment, but that does not require doing complex work duties. More specifically, the claimant is unable to perform complex duties that involve in-depth multilayer decision-making or supervisory tasks, or perform tasks that require facts, figures, or abstract ideas at a high level of complexity, the health or safety of others, or fiduciary responsibilities. The claimant is able to concentrate and focus for two-hour periods with routine breaks, and pace and persist for 8-hour workday and 40-hour work week despite psychological symptoms. Due to periodic uncontrolled psychological symptoms, the claimant will have some difficulty maintaining concentration for complex tasks and will experience some lapses on some tasks that require sustained attention. Claimant can relate to supervisors and peers on a superficial work basis, however, would work best in setting with infrequent contact and longer periods of solitary work and unable to interact appropriately or tolerate contact with the public but can adjust to a work situation and some changes in a usually stable work situation (1A/3A). The undersigned finds the above limitations are somewhat persuasive, as they are supported by the provided narrative. However, in light of the claimant's testimony, his presentation at the mental consultative examination, and the opinion of his counselor, which are inconsistent with the opinions of Dr. Jones and Dr. Farrell, additional limitations are warranted.



The undersigned has also considered the Disability Determination Explanation (physical-initial level) of Scott Newton, M.D., dated January 24, 2022, who opined the claimant is able to perform light, with environmental limitations of the need to avoid concentration exposure to noise and vibration (1A). This opinion is not well supported and in inconsistent with other evidence of record, including the opinion of Dr. Coffman, who reviewed the record at the reconsideration level. Thus, the undersigned finds is opinion unpersuasive.

The undersigned has further considered the Disability Determination Explanation (physical-reconsideration level) of David Coffman, M.D., dated October 5, 2022, who opined the claimant is able to perform light, with standing and walking limited to 4 hours in an 8-hour day, with frequent crouching, and occasional climbing of ramps and stairs, ladders, ropes and scaffolds, stoop, kneel and crawl. He also opined the claimant should avoid concentrated exposure to noise, as he has mild bilateral hearing loss that might result in difficulty hearing soft voices, speakers at a distance, or understanding conversation in noisy environments (3A). The undersigned finds that the finding of Dr. Coffman is more persuasive, as it is supported by his narrative. Moreover, the finding is consistent with other evidence of record, including treatment records documenting difficulty with standing and walking.

The undersigned has also considered the consultative physical examination by Dr. Young, as discussed at length above and finds the examination generally supports the above-stated residual functional capacity (7F). Regarding limitations, he primarily used terms such as "moderate" or severe" but these are not vocationally relevant terms. Thus, it is less persuasive.

Additionally, the undersigned has considered the statement by his counselor, dated July 4, 2022 (6F; duplicated at 9F/16) and finds it to be supported by her treatment notes. Moreover, it is consistent with other evidence of record, including presentations to other treatment providers and consultative examiners.

**6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

The claimant has past relevant work as an industrial maintenance technician, DOT #638.281-014, heavy exertion, performed at very heavy, skilled (SVP-7); electrician's helper, DOT #829.684-022, medium exertion, performed at very heavy, semi-skilled (SVP-3) (composite job); stacker, DOT #929.687-030, heavy exertion, performed at very heavy, semi-skilled (SVP-3) (composite job); and electrician, DOT #824.261-010, medium exertion, performed at medium, skilled (SVP-7).

The demands of the claimant's past relevant work exceed the residual functional capacity.

**7.     The claimant was a younger individual age 18-49 on the established disability onset date (20 CFR 404.1563).**

**8.     The claimant has at least a high school education (20 CFR 404.1564).**



**9.     The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 CFR 404.1568).**

See Next Page

At the hearing, the vocational expert testified that the above determine residual functional capacity would eliminate competitive work. Therefore, the undersigned concludes the claimant's past work would not result in transferable skills to other occupations within the above residual functional capacity.

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).**

If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. To determine the extent to which the claimant's additional limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors there are no jobs in the national economy that the individual could perform.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, a finding of "disabled" is appropriate under the framework of the above-cited rule.

**11. The claimant has been under a disability as defined in the Social Security Act since October 31, 2019, the alleged onset date of disability (20 CFR 404.1520(g)).**

**DECISION**

Based on the application for a period of disability and disability insurance benefits filed on January 7, 2022, the claimant has been disabled under sections 216(i) and 223(d) of the Social Security Act since October 31, 2019.

/s/ *Mary M. Renfroe*

Mary M. Renfroe
Administrative Law Judge

May 13, 2023
Date

# EXHIBIT F

Mr. Burlew is a combat Veteran who is struggling with symptoms related to chronic PTSD and hx of multiple concussions. He is having some physical struggles related to low back fracture that fused in an odd position and now he has one leg longer than the other. He walks leaning to the right. He has been having struggles with grip and will commonly drop dishes. Veteran previously struggled with anger outbursts and would try to cope by drinking alcohol and taking pain pills. He now uses his christian faith as a means of coping with his

symptoms. He is able to recognize when his mind "is not right" and he will
separate himself from his family until he can change his mindset. He struggles with paranoia and hypervigilence. He isolates to his property and will at times,

"go off the grid" and hide in the woods around his home. He has an active legal
case. He tries to keep his mind occupied through reading the bible, gardening or

spending time with his family. CSC educated Mr. Burlew and Ms. Bowen about the PCAFC application process. Consult submitted for VFAI. Veteran and his wife participated in the assessment and voiced agreement with plan of care.

CSP staff will coordinate the following:
 Veteran Functional Assessment Instrument
 Caregiver/applicant(s) assessment

/es/ Tanya Gutierrez, LCSW
Caregiver Support Coordinator
Signed: 09/08/2022 15:12

| | |
|---|---|
| Date/Time: | 31 Aug 2022 @ 1015 |
| Note Title: | CSP SUPPORT NOTE |
| Location: | OKLAHOMA CITY OK VAMC |
| Signed By: | GUTIERREZ,TANYA |
| Co-signed By: | GUTIERREZ,TANYA |
| Date/Time Signed: | 31 Aug 2022 @ 1016 |

Note

 LOCAL TITLE: CSP SUPPORT NOTE
STANDARD TITLE: CAREGIVER CERTIFICATE
DATE OF NOTE: AUG 31, 2022@10:15    ENTRY DATE: AUG 31, 2022@10:15:34
   AUTHOR: GUTIERREZ,TANYA    EXP COSIGNER:
   URGENCY:                STATUS: COMPLETED

CSC contacted Ms. Bowen, Veteran's wife/identified caregiver, by phone to discuss scheduling of Veteran and Caregiver clinical assessments. CSC offered next available date (9/7 @ 930) and she voiced agreement. No other needs identified at this time.

# EXHIBIT G

11/12/2015 16:30          /es/ Erica Camilletti, PA-C
                          Altus VA Clinic


**PROGRESS
NOTES*********************************************************************
--------------------------------------------------------------------------------
---

 LOCAL TITLE: LOPC NURSE
STANDARD TITLE: PRIMARY CARE NURSING NOTE
DATE OF NOTE: OCT 22, 2015@15:31    ENTRY DATE: OCT 22, 2015@15:31:12
     AUTHOR: RIVAS,BETHZABE I    EXP COSIGNER:
 INSTITUTION: LAWTON (OPC)
    DIVISION: LAWTON OPC
     URGENCY:                              STATUS: COMPLETED

Veteran is asking if Psychologist can call him at  Cell: (580)280-1950.

/es/ BETHZABE I CLARE
RN
Signed: 10/22/2015 15:31

Receipt Acknowledged By:
10/22/2015 16:09          /es/ CHRISTOPHER J REVIS PHD
                          Clinical Psychologist


**PROGRESS
NOTES*******************************************************************
--------------------------------------------------------------------------------
---

 LOCAL TITLE: OEF/OIF/OND SCREENING FOR CASE MANAGEMENT
STANDARD TITLE: OEF/OIF NOTE
DATE OF NOTE: OCT 13, 2015@16:07    ENTRY DATE: OCT 13, 2015@16:07:44
     AUTHOR: GUTIERREZ,TANYA    EXP COSIGNER:
 INSTITUTION: OKLAHOMA CITY VAMC
    DIVISION: OKLAHOMA CITY VAMC
     URGENCY:                              STATUS: COMPLETED

OEF/OIF/OND Screening for Case Management
Administered over the phone

Name: BURLEW,BENJAMEN S Full SSN: 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
Gender: MALE
Address:  405 N 5TH ST
City, State Zip: CACHE, OKLAHOMA, 73527
Telephone:  (with area codes)
                    Home Phone: (580)280-1950
                    Cell Phone:
                    Work Phone:
MILITARY HISTORY:
ARMY, Active Duty, Reserves
Dates of service:
       Reserves 1998-2001
       Active Duty 2001-2009

COPY MADE BY VARMC, ST. LOUIS FROM A RECORD IN VA'S POSSESSION

Did you serve in a war zone?    Yes
        Dates/Locations of deployments:
        2003 Iraq
        2005 Afghanistan
        2007-2008 Afghanistan
MOS:  Range Battalion/Infantry - 2 years, then Special Ops Communications
Type of DC: Honorable
Rank at DC: E5
Awards/Decorations: Bronze star with valor, Bronze star, 2 ARCOM's with valor,
ARCOM, Bronze star, AAM's, Good Conduct Medal, and others.

Disciplinary Actions:  Did you receive any of the following?
        a.  Court Martial                    No
        b.  Article 15's                     No
        c.  Other                            No
        (If yes,please list or describe)
Combat injuries sustained? Yes
ankle fracture, malaria, PTSD, TBI and other issues that were treated down range
and not documented.

Any language barriers/preferences that should be considered in providing care?
No
Any cultural issues/factors that should be considered in providing care?  No
Any spiritual issues/factors that should be considered in providing care?  No

MENTAL HEALTH:
Mental Health Services requested:
    Referred to:  Already established with Lawton CBOC.

Veteran reported that he struggles with anxiety, irritability, sleep
difficulties and nightmares. He reported that his iritability has improved some,
since starting a medication. He reported that his sleeping medication helped him
sleep through the night, but he was in a continual nightmare, where he is
typically able to wake himself up. He reported that he has not taken that
medication since. Swk/CM encouraged Veteran to speak with his MH provider. He
reported that he has an appointment next Tuesday (10/20).

ACCESS TO CARE:
[ ]   Dental: Not eligible
[X]   Vision: Eligible
[X]   Medical: Established
      PC Assignment:  CAMILLETTI,ERICA LAUREN
      Appointment:  9/24/2015
[X]   TBI: Appointment scheduled 12/3
[X]   Other Specialty: Veteran reported that MH provider plans to refer him
for a sleep study to rule out concerns for sleep apnea.
[X]   Mental Health: Established with Lawton CBOC. Veteran reported follow up
scheduled for 10/20.

REGISTRIES:
   Iraq Registry, Airborne Hazards Registry
Discussed registries with Veteran. Per his request, will mail registry
information to him.

COPY MADE BY VARMC, ST. LOUIS FROM A RECORD IN VA'S POSSESSION