**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, ) | |
| ) | |
| v. ) | Case No. 1:21-cr-647 |
| ) | |
| BURLEW ) | |
| ) | |

**DECLARATION OF ATTORNEY BENJAMEN BURLEW**

Pursuant to 28 U.S.C. § 1746, I, Benjamin Burlew, hereby declare as follows:

    1.    I am currently being held in the D.C. Jail's Central Treatment Facility (CTF) in Washington, D.C.

    2.    I was arrested on August 19, 2021, for my participation in the events of January 6, 2021.

    3.    I am a fully disabled veteran. I fought for this country as an Army Ranger. I was deployed after September 11, 2001 to Iraq and Afghanistan where I served as a combat warrior until 2009. During that time, I was engaged in over 500 firefights. In 2007, while engaged in a firefight, I fell off of a mountain. As a result, I broke my back and suffered other severe injuries that I continue to suffer from to this day and will suffer from for the rest of my life. By the Grace of Almighty God, Our Father in Heaven, Creator of the Heavens and Earth, I was not killed that day. I lost so many friends in combat I cannot even count. Because I was still able to walk after I fractured my back, I remained in combat for another 2 years and continued fighting. The army provided me with pain pills and kept me in action because I was needed. As a result, my back fused incorrectly and did not heal properly.

    4.    I was sent home to the United States in 2009. I received several honors for my service, including the Bronze Star Medal with letter "V" device; Army Commendation Medal with

2 bronze oak leaf clusters; Army Achievement Medal with 1 bronze oak leaf cluster; Good Conduct Medal, 2nd award; National Defense Service Medal; Overseas Service Ribbon; Combat Infantryman Badge 1st Award; Expert Infantryman Badge; Marksman Badge with Grenade Bar and Rifle Bar; Parachutist Badge-Basic; Ranger Tab; Global War on Terror Service.

5. I have been diagnosed with severe PTSD. It is well documented by the VA. Attached as Exhibit A is a decision by the Department of Veterans Affairs documenting my many physical and mental disabilities.

6. After I returned home, unfortunately, like many veterans, I fell victim to drug addiction. It was only with God Almighty's help and grace that I was able to recover. To this day I suffer from PTSD and withdrawal and I take comfort and shelter under God Almighty's wings by reading from the Bible.

7. When I was arrested on August 19, 2021, the officers grabbed me and tried to cuff me behind my back. This would be excruciatingly painful for me because of my injuries. I tried to explain that to the officers but they would not listen. As they pulled my hands behind my back, I involuntarily struggled for a few moments. Nobody was hurt, I did not strike out at anyone. I called out my social security number and my name because that is what you are instructed to do in combat when you are being detained. I was trying as best as I could to signal to the officers that I was willing to be detained, but the issue was simply how I was to be handcuffed. I called out over 15 times "cuff me in the front, cuff me in the front!" I otherwise verbally tried to explain to the officers why I was struggling and repeatedly begged them to cuff me with my hands in front. Eventually, one of the officers, who also served in the Army, had mercy and uncuffed me from behind and cuffed me in the front because he realized how much pain I was in. My intention was never to resist arrest and it would have been objectively obvious to anyone observing the situation that I

did not intend to resist arrest, but rather I was just trying to get the officers to accommodate my severe disabilities and spare me from excruciating and unnecessary pain. The officer's body camera footage will easily confirm that I did not resist arrest.

8. I was ultimately released on my own recognizance. The Government tried to convince the judge that I resisted arrest, but the judge did not believe them. She could clearly see that I was in pain. This is reflected on the transcript. Despite the fact that the judge at that time did not believe the government, to this day they continue the lie that I tried to resist arrest.

9. For a year and a half there was not a single issue with my release.

10. I complied with every condition of release. There were no complaints to the contrary from the pretrial coordinator assigned to my case. His name is Aaron Tyler and he never mentioned that there was even the slightest problem or issue.

11. My attorney, Robert Jenkins was terrible. He was appointed by the court. I have never been in trouble before in my life and have never needed a criminal attorney, so I did not know what to expect. He did absolutely nothing for me. He did not provide me with my discovery. In fact, he told me that he was not given discovery. He met with me by zoom twice to show me some videos. The meetings were about 30 minutes. These meetings were in February or March of 2023. We arranged initially to meet by zoom every Wednesday while my children were in gymnastics. In those two meetings he showed me only open source video that I could find myself online. He did not show me any body camera videos. I had many questions and he would not answer them. I pointed to individuals and said I want them to be witnesses, how can we find out who they are? He said there is nothing we can do. He said that we cannot get any more discovery or ask the Government for anything. I told him that I wanted him to raise my PTSD as a defense. He adamantly refused to do so. He then ignored all of my other requests. He told me that he was

only permitted to use evidence provided by the Government. I knew that to be false. Trial was scheduled for December of 2023. I did not see him again or speak to him again from March until September or October. After March, we did not have a single substantive conversation about my defense. He did not prepare me at all for the trial. I doubt that he did any preparation for the trial at all.

12.     A pretrial conference was scheduled for November 30, 2023. I asked Jenkins if he could ask the court if I could appear by zoom. He refused to ask the court. Instead, he told me that I must appear in person and that there is no alternative and that the court doesn't do zoom meetings anymore. I told him that I had a big problem in getting to the court for the pretrial conference. We don't have a lot of funds. I am fully disabled and me and my wife and three children live mostly on my disability. Further, I have not flown in many years. Flying is incredibly difficult for me and can only be done with lots of pain medication which I prefer not to take because I am a recovering addict. I also rarely drive more than 45 minutes away from my home because of my disabilities. I have chronic back pain and rheumatoid arthritis that make travel extremely difficult. I did not know anyone who could drive me. My wife could not leave the children at home. We don't have a friend who could take the time to drive me, and we could not afford a driver. I told all of this to Jenkins. He did not offer any alternatives or any advice other than that I had to get there. So I decided to attempt to drive myself. I left with plenty of time to arrive for the conference on November 30. On the way, I had an unforeseeable mental health emergency. My PTSD was triggered in a way that I had not experienced in many years, since 2019, due to the anxiety of the upcoming trial that I did not feel prepared for and that I did not think my lawyer was prepared for, together with the anxiety of driving on my own for the 17 hour drive. I stopped the car and blacked out. After several days I made my way back home. I had a breakdown that I did not recover from

for several months. Part of that was the anxiety that my lawyer did not call. Every day my wife and I checked the docket to see if there was an update, but there were none. If there had been one, I would have complied with whatever I was instructed to do. During that time, Jenkins did not call me even one time. His office sent a generic holiday greeting card sometime around December. He did not advise me what to do. He did not tell me what the consequences were for missing the hearing. He didn't even tell me what happened at the hearing or what he told the judge or what the judge told him. To this day, I don't know what happened at that hearing.

13. My wife looked at the docket after the hearing and all it said was that the trial was vacated. I was not contacted by the Government or the Court or my pretrial coordinator. I didn't hear from anybody until May 8, 2024.

14. On May 8, 2024, my wife told me that the Government had reached out to her. I was told that I could appear voluntarily at a hearing at the Federal Court in Tulsa, Oklahoma on May 13, 2024. I did exactly what I was told and appeared at the hearing on the date. For the hearing we were given a local public defender. The Court ordered that I be detained.

15. I was suddenly taken into custody in front of my 8-year-old son and my wife. This was completely unexpected. I was not permitted to even say goodbye to him. **_This has severely affected him._** I still cannot understand for the life of me why they would not let me say goodbye to my 8-year-old son.

16. From the court I was taken to a local jail in Oklahoma. Then a few days later I was moved to another jail in Oklahoma. This was very disorienting. It was also incredibly, unimaginably, and excruciatingly painful for me due to my many disabilities. It was also incredibly traumatizing due to my psychological disabilities. I did not know where I was or what time it was or what day it was. I did not know what my family knew. I did not know if I would ever go home.

I didn't understand what was happening to me. I was then transferred from Oklahoma to Washington, D.C. This was a long drive. We went hours without stopping for a break to stretch or go to the bathroom. I was chained and bound. There were no accommodations for my disabilities. Nobody even asked about my disabilities this entire time. In fact, when I got to the second jail in Oklahoma, I told them immediately that I was disabled, and they just said, "the Board of Prisons will decide." I was not given any medical attention even though it was obvious to anyone who looked at me that I was experiencing unbearable and indescribable pain. When the van came to Virginia, one of the other prisoners on the van had a heart attack. This was one of the scariest moments of my life, and I have served as a combat soldier for over a decade. It was so scary for several reasons. I had to watch this man, bound and chained convulse, grab his chest, gasp for his life, and gasp "I'm having a heart attack! I'm having a heart attack!" Every one of my instincts wanted to get up and help him, but I was bound and chained helplessly myself and in excruciating pain. I also saw my own life flash before my eyes. I thought at that moment that I would die, and my children and my wife would never see me again and perhaps not even hear about how I died. A million terrifying thoughts ran through my mind. I thought I would go insane.

17. That night I stayed in a jail cell at a sheriff's station in Virginia due to the unexpected stop. I did not sleep for even a second.

18. The next morning, I was taken straight to the Court house. I waited in the court house all day in the jail cell. There was nowhere to sit other than a hard bench against a cinderblock wall. I was left alone. I was in incredible pain. I sat there the entire day. At the end of the day, I was told there was no hearing that day, and I was to come back tomorrow.

19. The next day, I was brought back to the court house but I was brought before a magistrate judge. The judge said he could not rule on it. I was then sent back to the CDF.

20. I served in Iraq in Afghanistan for years. I lived in mud huts and shipping containers and in other similar conditions. I held enemy combatants in captivity. I can say without exaggeration that the conditions in the CDF are worse than anything I have ever seen or experienced. Nobody should be held in such conditions. Especially not in the United States of America.

21. First, I was placed in a tiny cell with nothing but a cot and a toilet. The toilet had a leak and there was two inches of toilet water on the floor. I used the blanket to try and mop up the water, but it was a mistake because it didn't make much of an impact, and then I had no blanket. I wouldn't need a blanket anyway because it was 90 degrees in the cell. I had to strip down to nothing but my underwear. I was put in the jail on May 20, 2024. I was not given a change of clothing until June 8, 2024, after my wife complained. I wore the same underwear from May 13 until June 8. The jail also had rats that would scurry across the floor through the toilet water. There were water bugs the size of large apricots.

22. During the week, I was confined to my cell for 23 hours a day and given one hour to shower and call my wife. I was never allowed outside for the entire time I was in CDF from May 20 until June 10 in the evening. Even then, I was only transferred to CTF which wasn't much better, and there I only got outside for the first time for an hour on July 2, and then not again until July 24. On the weekends in CDF, I was locked down for 72 hours straight, confined to my cot, in my underwear, sweating, unable to move, in excruciating pain, disgusted by the toilet water and the rats and the bugs and the stench. Those weekends were unbearable. I didn't even have a Bible. I had nothing but the thoughts in my head.

23. When the guards would turn the lights on in the cell it got hotter in the cell, and it felt like they were cooking me. During the 72-hour weekend lockdowns, sometimes the guards

would leave the lights on for hours and hours at a time. When the lights were off it was cooler, but it was too dark to read unless you sat or lay on the floor and read by the light that came through the tray hole. There was no air conditioning and only a single fan, but some of the prisoners would unplug the fan periodically to use the outlet to smoke drugs. I had to choose between leaving the tray hole open to get some ventilation or covering it up to prevent the odor of the drugs into the cell. I was told that the drugs they were smoking in the jail is fentanyl. How do they even get fentanyl in a locked down facility?

24. I frequently asked for mental health care, but the guards just told me to "quit crying." I was not given any mental health care during the month in CDF, even after a supervisor told me that I could receive mental health care.

25. The guards did not provide grievance forms so the process to complain was not available to us. Even if it were, the grievance process takes weeks and months so there is no recourse for the prisoners. When I got to CTF, I put in many grievances forms, but to no avail.

26. On May 23, Jenkins came to visit. He told me that the judge was "pissed at me" and that there was no way that the judge would grant me bail. He told me that I had no choice but to concede to confinement and he refused to make any arguments on my behalf to get me out. He told me that I would not go to trial for at least another year, which meant to me that I would be locked up for that amount of time, at least. He strongly implied the only way that I could get out would be if I signed a plea deal. I felt that I had no choice but to agree. I told him that I would sign a plea deal and give up my right to a trial if it would get me out of jail and back to my wife and children. But I told him that I would only sign it if my wife reviewed it and approved it. He said he sent it to her. That was false. I found out later that he lied and that he never sent the deal to my wife to review. She only received it after I had already signed it.

27. A hearing was scheduled for a few days later on May 30. My lawyer told me not to raise the conditions of confinement because it would only further enrage the judge who was already "pissed at me." He knew about my conditions of confinement and did not raise them himself. He made me believe that if I just kept my mouth shut, I would get out of CDF and be sent to CTF. I was told that CTF was much better than CDF. It is better, but not by much. I asked my lawyer to at least ask for a Bible as I had been without a Bible for over two weeks. He said he would.

28. At the hearing I answered yes to all of the judge's questions. All I could think about was getting home to see my wife and children, or at least getting moved to CTF. In retrospect, I feel that I was completely coerced into the plea deal. I would not have agreed if not for the circumstances that I was experiencing in the CDF and in everything that had happened to me since May 13. When I was in CDF, it was so miserable and unbearable, that whenever I was let out of my cell, whether for a phone call or for court, all I could think about was how great it was to have some air. I could not concentrate on anything and was not in my right mind at all.

29. Over that time period from May 13 to May 30, I experienced unbearable trauma, physically and mentally. I was deprived of basic nutrients. My nails have become brittle. As I sit here now, I can just peel away my fingernails and they come right off. One of my toe nails just fell right off. I feel as though my body is falling apart. During the transfers and my time in CDF I lost what must have been twenty pounds. When I mentioned it to one of the guards, she was a Lieutenant, she just laughed and said, "it's a great weight loss program." I felt humiliated. Worse, I felt terrified that I was being guarded by people who had no human empathy. It is impossible to imagine that feeling if you have not experienced it yourself.

30. After I signed the plea deal and it was accepted at the hearing, I still was sent back to CDF for another 11 days. During that time, I was still deprived of a change of clothing, and I

was not given a Bible. On the bright side, they did move me out of the cell with the leaky toilet. I was moved to a cell across the hall where I could still see the cell with the leaky toilet. One day, a maintenance man came into the cell. He looked at the toilet for less than one minute. He went to an area behind the cell and opened up a box with a key, turned a faucet, and solved the problem just like that. Me and another prisoner saw this. We just stared with our mouths open. We couldn't believe how easy it was for the jail to fix the problem, and yet they let it persist for days and days while I lived in the cell. We looked at each other and we just started laughing uncontrollably. It was one of the brightest moments during that dark time. There were still rats and giant bugs in my new cell. And it was still 90 degrees. I should mention that I also contracted malaria in the past so my body has a difficult time adjusting to heat. When I moved to the new cell, I was able to scare away the rats and sit on the floor under the sink and every so often drench my head in the sink to regulate my body temperature. I did that every hour for days. This was a great luxury that I did not enjoy in the first cell with the toilet water on the floor. In the new cell, I had the choice to lay on the floor or my cot, rather than just my cot, while I was locked down for 23 hours during the week and 72 hours over the weekend. My arthritis was so bad, I barely slept for the time I was in CDF.

31.     On June 10, I was finally moved to CTF. I was put into the pod that is reserved only for January 6 defendants. I was told that a decision was made long ago to segregate January 6 defendants for their safety from the other prisoners. We were recently told that this policy of segregation is going to end. Everyone is freaking out and very scared as to what will happen. On July 26, we demanded to see a Lieutenant. When the Lieutenant arrived, we were told that the policy of segregation is for our safety and security and will remain in place. But we are receiving mixed messages and now we fear that we are going to be mixed with the general population and we fear we may be in danger.

32. I was not permitted out doors to see the sky from May 20 when I arrived at CDF until July 2, and then only for one hour. The next time I was permitted an hour outdoors under the sky was July 23. That is one hour of being outside in 60 days. It is a great day when I am able to see the sun.

33. One of the worst things about the jail is that there is no routine. I would have expected that at the very least, the days would be regimented. Wake up at a certain time, meals at a certain time, medicine at a certain time, shower at a certain time, outdoor rec at a certain time. But there is no set schedule. Every day is different. We never know when our meals are coming. When we will be given our medicine. We don't have a set schedule for outdoor rec. Its completely random. And if you miss it by a second, you cannot go outside. It's very disorienting and makes no sense. It's terrible for my mental health. I benefit from predictability, as do most people.

34. Just writing this down has been in a sense therapeutic but also painful. I am in constant anguish, both physically and psychologically.

35. Everything that I wrote above can be confirmed by many witnesses. If given a chance to testify independently, all of us would tell the same story with the same horrifying details. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 31, 2024

/s/ Benjamen Burlew

Benjamen Burlew

BENJAMEN BURLEW

3 of 5



**DEPARTMENT OF VETERANS AFFAIRS**
Veterans Benefits Administration
Regional Office

**BENJAMEN BURLEW**



**Represented By:**
**HARRY J BINDER**
Rating Decision
10/20/2022

## INTRODUCTION

The records reflect that you are a Veteran of the Gulf War Era. You served in the Army from June 14, 2001, to February 5, 2009. You filed a claim for increased evaluation that was received on March 2, 2022. Based on a review of the evidence listed below, we have made the following decision(s) on your claim.

## DECISION

1. Entitlement to individual unemployability is granted effective January 20, 2021.

2. Basic eligibility to Dependents' Educational Assistance based on permanent and total disability status is established from January 20, 2021.

3. Evaluation of posttraumatic stress disorder, which is currently 70 percent disabling, is continued.

4. Evaluation of left ankle strain status post fracture, which is currently 10 percent disabling, is continued.



OIJPZ01200460300080011 081647

Evidence we have used to grant permanent and total disability status: VA contract examination from QTC dated June 4, 2014; VA contract examinations from VES dated July 21, 2022, and August 17, 2022.

### 3. Evaluation of posttraumatic stress disorder currently evaluated as 70 percent disabling.

The evaluation of posttraumatic stress disorder is continued as 70 percent disabling.

We have assigned a 70 percent evaluation for your posttraumatic stress disorder based on:
- Anxiety
- Chronic sleep impairment
- Circumlocutory speech
- Circumstantial speech
- Depressed mood
- Difficulty in adapting to a worklike setting
- Difficulty in adapting to stressful circumstances
- Difficulty in adapting to work
- Difficulty in establishing and maintaining effective work and social relationships
- Disturbances of motivation and mood
- Forgetting directions
- Forgetting names
- Forgetting recent events
- Forgetting to complete tasks
- Impaired impulse control
- Impairment of short- and long-term memory
- Mild memory loss
- Near-continuous depression affecting the ability to function independently, appropriately and effectively
- Near-continuous panic affecting the ability to function independently, appropriately and effectively
- Obsessional rituals which interfere with routine activities
- Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood
- Panic attacks more than once a week
- Retention of only highly learned material
- Speech intermittently illogical
- Speech intermittently irrelevant
- Speech intermittently obscure
- Stereotyped speech
- Suspiciousness
- Unprovoked irritability with periods of violence

The overall evidentiary record shows that the severity of your disability most closely approximates the criteria for a 70 percent disability evaluation. (38 CFR 4.7, 38 CFR 4.126)

A higher evaluation of 100 percent is not warranted for a mental disorder unless the evidence

BENJAMEN BURLEW

BENJAMEN BURLEW

4 of 5

shows total occupational and social impairment, due to such symptoms as:
• Gross impairment in thought processes or communication
• Persistent delusions or hallucinations
• Grossly inappropriate behavior
• Persistent danger of hurting self or others
• Intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene)
• Disorientation to time or place
• Memory loss for names of close relatives, own occupation, or own name. (38 CFR 4.125, 38 CFR 4.126, 38 CFR 4.130)

### 4. Evaluation of left ankle strain status post fracture currently evaluated as 10 percent disabling.

The evaluation of left ankle strain status post fracture is continued as 10 percent disabling.

We have assigned a 10 percent evaluation for your left ankle strain status post fracture based on:
• Painful motion of the ankle (38 CFR §4.59 allows consideration of functional loss due to painful motion to be rated to at least the minimum compensable rating for a particular joint. Since you demonstrate painful motion of the ankle, the minimum compensable evaluation of 10 percent is assigned.)

Additional symptom(s) include:
• Slight limitation of motion of the ankle based on plantar flexion less than 45 degrees

The provisions of 38 CFR §4.40 and §4.45 concerning functional loss due to pain, fatigue, weakness, or lack of endurance, incoordination, and flare-ups, as cited in DeLuca v. Brown and Mitchell v. Shinseki, have been considered and applied under 38 CFR §4.59.

A higher evaluation of 20 percent is not warranted for limitation of motion of the ankle unless the evidence shows:
• Marked limitation of motion of the ankle based on dorsiflexion less than 5 degrees or plantar flexion less than 10 degrees. (38 CFR 4.71a)

### 5. Evaluation of tinnitus currently evaluated as 10 percent disabling.

The evaluation of tinnitus is continued as 10 percent disabling.

We have assigned a 10 percent evaluation for your tinnitus based on:
• Recurrent tinnitus

A single evaluation for recurrent tinnitus is assigned whether the sound is perceived in one ear, both ears, or in the head.

This is the highest schedular evaluation allowed under the law for tinnitus. (38 CFR 4.87)



BENJAMEN BURLEW

5 of 5

**REFERENCES:**

Title 38 of the Code of Federal Regulations, Pensions, Bonuses and Veterans' Relief contains the regulations of the Department of Veterans Affairs which govern entitlement to all Veteran benefits. For additional information regarding applicable laws and regulations, please consult your local library, or visit us at our website, www.va.gov.