**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-647-RDM** |
| **BENJAMEN SCOTT BURLEW,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Benjamen Scott Burlew to 51 months' imprisonment (the top of the guideline range as calculated by the government), three years' supervised release, $2,000 in restitution, and a mandatory assessment of $100.

## I.    INTRODUCTION

Burlew participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Burlew joined the mob on the West Plaza, dove at an officer, and attempted to pull that officer from the police line and into the mob. He then pursued a photographer on the U.S. Capitol Grounds and shoved the photographer over a wall. And, while in the scaffolding that had been erected to construct the inaugural stage, Burlew passed a knife to another rioter who then used that knife to shred the tarp covering the scaffolding. Burlew failed to appear at two hearings scheduled before this Court and then filed an affidavit replete with falsehoods.

The government recommends that the Court sentence Burlew to 51 months of incarceration; the high end of the Sentencing Guideline range of 41-51 months. A 51-month sentence reflects the gravity of Burlew's conduct and balances Burlew's decision to plead guilty with his decisions to fail to appear and obstructive conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF 57, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.      Burlew's Role in the January 6, 2021 Attack on the Capitol**

*Pre-January 6 Video*

Before traveling to Washington, D.C., Burlew recorded a video of himself loading a magazine and talking about his plans:



*Image 1: Screenshot from Exhibit 1, at 00:12, showing Burlew loading a magazine*

As Burlew explained,

Donald Trump is calling for us to come to America right now to save this place. I know there's so many people making preparations and going, and, uh, trying to make a difference. There's a bunch of us going right now. We're all coming from red states. And these red states, we don't mess around. We're making final preparations. If you don't do what we want you to, things are going to change and they're going to change for America, and they're going to change for freedom.

*See*, Exh. 1.

*Approach to the Capitol*

On January 6, 2021, the Capitol Building and its surrounding grounds were closed to visitors, and a restricted perimeter had been established around its grounds in anticipation of the

3

Vice President's visit and the certification of the 2020 election. The restricted perimeter was made clear to the public through linked, metal bike-rack barriers and snow fencing, many of which bore signs that read "Area Closed By Order of the United States Capitol Police Board" ("Area Closed signs"). Bike-rack barriers had been placed on the sidewalk across from the Peace Circle to mark the western boundary of the restricted area.

Burlew, who traveled to Washington, D.C. from his home in Texas, was part of the early group that swept past those barricades and marched onto Capitol grounds. As he made his way towards a line of officers who had formed a new defensive line on the West Plaza, he yelled, "what are we waiting for," and "what the fuck." *See*, Exh. 2, at 00:03-00:07.



*Image 2: Screenshot from Exhibit 2, at 00:03,*
*showing Burlew (circled in red) on the West Plaza*

About 20 seconds later, he turned and berated a line of officers trying to prevent rioters

from entering the scaffolding that had been erected to build the stage for the upcoming inauguration, screaming "fuck you," and "you're a sorry motherfucker, all of you." *See*, Exh. 2, at 00:30-00:39.



*Images 3 (left) and 4 (right): Screenshots from Exhibit 2, at 00:34 (Image 3),*
*and 00:00 (Image 4), showing Burlew (circled in red) berating a line of officers*

The way he was screaming at officers caused a fellow rioter to accuse Burlew of being a member of Antifa. *Id.* at 00:39-00:59. Other individuals in the crowd had to step in to stop Burlew from attacking his fellow rioter. *See id.*

By 1:15 p.m., Burlew made his way back to the West Plaza and towards the police line and again began yelling at officers. While pointing at an officer, Burlew said, "let's get that motherfucker right there." *See*, Exhibit 3, at 00:34-00:45.



*Image 5: Screenshot from Exhibit 4, at 00:36, showing*
*Burlew (circled in red) pointing and yelling at officers*

To deter rioters from continuing to advance on the police line, an officer deployed a chemical irritant. Burlew dove through the spray and rushed the line. He dove at Metropolitan Police Officer O.F., grappling with both arms, and heaving his body weight to try to pull the officer from the relative safety of the police line.

6



*Image 6: Screenshot from Exhibit 5, at 00:03,*
*showing Burlew (circled in red) grabbing an MPD Officer*



*Image 7: Screenshot from Exhibit 6, at 00:33,*
*showing Burlew (circled in red) grabbing an MPD Officer*

After assaulting MPD Officer O.F., Burlew retreated into the crowd and discarded some of the clothes that had been sprayed with a chemical irritant. He reapproached the police line approximately 15 minutes later.



*Image 8: Screenshot from Exhibit 7, at 00:06,
showing Burlew (circled in red) near the police line*

After yelling at officers again, Burlew and a group of other rioters pursued a photographer across the West Plaza, where Burlew ultimately pushed the photographer over an Olmstead wall. *See*, Exh. 7, at 1:00 – 1:17 (Burlew yelling at officers).



*Image 9: Screenshot from Exhibit 8, at 00:17,*
*showing Burlew (circled in red) after he pushed a photographer over a wall*

*See also,* Exhibit 9, at 00:47-00:58.

From there, Burlew made his way to the Northwest Stairs where he again yelled at officers attempting to protect the Capitol.

9



*Image 10: Screenshot from Exhibit 10, at 00:46,*
*Showing Burlew (circled in red) yelling at police*

At approximately 1:49 p.m., Burlew climbed a metal barricade, turned on its side like a ladder, to

get onto the Northwest Stairs. He stood on the balustrade and encouraged other rioters to join him.



*Image 11: Screenshot from Exhibit 11, at 00:06,*
*Showing Burlew (circled in red) on the Northwest Stairs balustrade*

Next, he went under the tarp covering the inaugural stage construction and climbed on the scaffolding.



*Image 12: open-source image showing Burlew climbing the scaffolding*

At one point, he overlooked the West Plaza, made an explicit gesture and yelled, "fuck you."



*Image 13: Screenshot from Exhibit 12, at 00:21,*
*showing Burlew (circled in red) making an explicit gesture*

At one point, as the crowd yelled "cut it," Burlew passed a knife from one rioter to another rioter,

which a rioter then used to slice through the tarp.



*Image 14: Screenshot from Exhibit 13, at 00:36,*
*Showing Burlew (circled in red) passing a knife to another rioter*

### Burlew's Admissions to Pushing the Reporter

Following Burlew's initial arrest, he was temporarily detained. In a recorded jail call, Burlew and his wife discussed the allegations that Burlew pushed a reporter. In one call, Burlew said "But I did help, I did push him over. I mean, it is what it is." Exhibit 14.

### Flight and Motion to Withdraw Guilty Plea

Trial was scheduled for the week of December 11, 2023, and a pre-trial hearing was scheduled for November 30, 2023. *Minute Order dated October 27, 2023*; *Minute Order dated November 28, 2023*. Despite knowledge of the hearing, Burlew failed to appear at the pre-trial hearing on November 30, 2023. The Court reset the pretrial conference for December 8, 2023, and specifically ordered Burlew to appear at the hearing. *Minute Entry dated November 30, 2023*. Again, Burlew failed to appear. Burlew claimed that he suffered a PTSD episode while traveling

14

to D.C. for the November hearing and returned home a few days later. But he did not contact the Court or his attorney anytime between November 30, 2023, and his arrest in May 2024.

### III.    THE CHARGES AND PLEA AGREEMENT

On March 23, 2022, a federal grand jury returned a superseding indictment charging Burlew with eight counts, including, assaulting, impeding, or obstructing certain officers, in violation of 18 U.S.C. § 111(a)(1). On May 30, 2024, Burlew was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Burlew now faces sentencing on one count of assaulting, impeding, or obstructing certain officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly calculates the Guidelines as follows:

<u>Count Two: 18 U.S.C. § 111(a)(1)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction | +2 |
| | **Total** | **22** |

**Total Adjusted Offense Level:** **22**

*See* PSR ¶¶49-58; Plea Agreement at ¶ 5(A).

Burlew objects to the two-level enhancement under U.S.S.G. § 3C1.1, claiming that the obstruction enhancement is "inappropriate" because Burlew "left the scene before the certification was obstructed." Burlew's argument is both contrary to the terms of the plea agreement and contrary to the purpose of this enhancement. Under U.S.S.G. §3C1.1, the offense level is increased by two levels when the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and the obstructive conduct related to the "offense of conviction and any relevant conduct." This enhancement includes "willfully failing to appear as ordered, for a judicial proceeding." *Id.* cmt. 4(E). Burlew willfully failed to appear for the pre-trial hearing on November 30, 2023, and the rescheduled pretrial conference on December 8, 2023.

---

[2] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

Burlew agreed to his enhancement when he signed the plea agreement. *See* Plea Agreement at ¶ 5(A).[3]

Finally, as noted in the PSR, Burlew is not eligible for a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Under Guideline 3E1.1, a defendant is eligible for a two-level decrease in the offense level where the "defendant clearly demonstrates acceptance of responsibility." In determining whether a defendant is entitled to a reduction for acceptance of responsibility, courts consider whether the "defendant falsely denies, or frivolously contests, relevant conduct," and conduct resulting in an enhancement under U.S.S.G. § 3C1.1. U.S.S.G. §3C1.1 cmt. 1(A), 4.

Although the Government agreed that, at the time Burlew pled guilty, he was eligible for a reduction under this guideline, his post-plea conduct demonstrates that he has not clearly accepted responsibility. The Plea Agreement accounts for this: Paragraph 5 of the plea agreement includes the following language:

> Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth above, should your client move to withdraw your client's guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement.

---

[3] By signing the plea agreement, Burlew also agreed that "neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above." Plea Agreement at ¶ 5(D). By objecting to the enhancement in the PSR, Burlew has "fail[ed] specifically to perform or to fulfill completely each and every one of [his] obligations under" the Plea Agreement and has therefore breached the agreement. *Id.* ¶ 12.

In moving to withdraw his plea agreement (an independent basis for the government to oppose the adjustment for acceptance or responsibility), Burlew provided materially false information to a judge, which also warrants an enhancement under U.S.S.G. §3C1.1. U.S.S.G. § 3C1.1, comment. (n. 4(B), (F)).

The D.C. Circuit recently considered the application of this guideline in the context of a January 6 case in *United States v. Alford*, No. 23-3023, 2024 WL 57356 (D.C. Cir. Jan. 5, 2024). In *Alford*, the defendant received a two-level sentencing enhancement under 3C1.1 when he provided "misleading testimony at trial." The Court affirmed the application of the enhancement even though the defendant's testimony fell "short of deliberate falsehoods" because it was "disingenuous and not entirely candid or truthful." *Alford*, 2024 WL 57356 at *7.

In *Alford*, the defendant testified that he traveled to D.C. to "enjoy [himself], take some pictures, enjoy some like-minded people." *Id.* at 7 n. 5. The defendant "also claimed not to notice the signs and barricades restricting access to the Capitol and claimed not to know that he was not allowed inside." *Id.* In addition, the defendant testified that, "once in the Capitol, he was just 'being a sightseer in D.C.'" *Id.* The enhancement applied because the defendant's testimony was "disingenuous and not entirely candid or truthful." *Alford*, 2024 WL 57356 at *7.

Like the statements made in *Alford*, Burlew's statements in conjunction with his attempt to withdraw from the plea agreement were disingenuous and not entirely candid or truthful. On May 30, 2024, defendant Burlew pleaded guilty to and was convicted of one count of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111. On July 31, 2024, the defendant moved to withdraw his guilty plea. *Motion*, ECF No. 62. As part of that filing, the

defendant submitted an affidavit making the following representations:

1.  "I told [Mr. Jenkins] that I wanted him to raise my PTSD as a defense. He adamantly refused to do so." *Affidavit*, ECF No. 62-3, at ¶ 3.

2.  That between November 30, 2023, and the date of his arrest, "Jenkins did not call me even one time. His office sent a generic holiday greeting card sometime around December." *Affidavit*, ECF No. 62-3, at ¶ 12.

3.  "I feel that I was completely coerced into the plea deal.   I would not have agreed if not for the circumstances that I was experiencing in the CDF and in everything that had happened to me since May 13."   *Affidavit*, ECF No. 62-3, at ¶ 28.

Although the defendant swore "under penalty of perjury" that the statements in his affidavit were "true and correct," *Affidavit*, ECF No. 62-3, at ¶ 35, these statements were misleading.

First, in September 2022, Mr. Jenkins *did* seek a mental health evaluation to determine competency and "insanity at the time of the offense." *Motion for Competency Evaluation*, ECF No. 26. The Court ordered the defendant to be evaluated by a licensed psychologist, to determine competency and sanity at the time of the offense. *Order*, ECF No. 30. After an evaluation that included a review of the defendant's available military and treatment records, as well as a lengthy in-person examination, the psychologist found that "objective psychological testing supported that [the defendant] is attempting to feign psychological problems, likely to manipulate or improve his legal situation." The psychologist also concluded that the defendant "can appreciate the nature of the charges against him and consult with his attorney to rationally assist in his defense, should he choose to do so."   Moreover, the psychologist found that the defendant "does not evidence any mental illness or cognitive deficits precluding his ability to appreciate the nature, quality, and wrongfulness of his actions." According to the psychologist, at the time of evaluation, the defendant was "adamant he will not enter a plea of not guilty by reason of insanity." *Id.* at 19. The

Court held a competency hearing in December 2022, and the Court treated the defendant's Motion for Competency Evaluation as withdrawn. *Minute Entry dated December 19, 2022.*  Thus, Burlew's claim that his attorney refused to pursue a PTSD defense is misleading and not entirely candid, and, having participated in the evaluation, knew that this statement was false.

Second, on August 15, 2024, at a hearing on Burlew's motion to withdraw his guilty plea, Burlew's former attorney advised the Court that he had attempted to contact Burlew and his wife after November 30, 2023, when Burlew failed to appear for his pretrial hearing.

Finally, Burlew's statements in his affidavit are inconsistent with both his sworn statements during the change of plea hearing and statements he made to his wife on recorded jail calls.   For example, on a May 22, 2024, jail call, Burlew said that he "was supposed to sign the plea deal when I was here, does that make sense, I had a break, I had a PTSD break that's why I didn't show up. Let's continue that process, get the plea done, and let's be done. I was coming here to sign it, so let's just sign it . . . I just want to finish what I had planned to do that I didn't complete because I had a mental break." He continued, "because I believe that is the right thing to do."

And at the change of plea hearing, the Court asked Burlew if his PTSD, social anxiety "or any other condition that you may be suffering from in any way affect your ability to make a knowing, voluntary and informed decision about whether to enter a plea of guilty or not?" While under oath, Burlew replied, "No, Your Honor." Plea Hearing Transcript, 8:5-23. The Court also asked whether "anyone made any promise…in connection with [the] plea other than what is in the plea agreement itself or what" the Court discussed at the hearing, to which Burlew responded, "No, Your Honor." Plea Hearing Transcript, 25:19-22. Ultimately, Burlew withdrew his motion,

but not before it became clear that pursuing his claim would constitute a waiver of the attorney-client privilege.

Moreover, based on his objections to the initial PSR, Burlew appears to be falsely denying or frivolously contesting relevant conduct. Indeed, Burlew objected to nine paragraphs that describe his statements before traveling to Washington, D.C., and his participation in the riot, despite the clear video evidence showing Burlew's conduct and his recorded admission to assaulting a member of the media.

Ultimately, Burlew's post-plea conduct renders him ineligible for a reduction for acceptance of responsibility. Burlew's objections to the PSR run afoul of the plea agreement, he moved to withdraw his guilty plea and made statements that were "disingenuous and not entirely candid or truthful" in conjunction with that motion, and Burlew frivolously disputes relevant conduct. A two-level reduction under U.S.S.G. § 3E1.1 is inappropriate here.

The U.S. Probation Office calculated Burlew's criminal history as category I, which is not disputed. PSR ¶ 60. Accordingly, based on the defendant's total adjusted offense level at 22, Burlew's Guidelines imprisonment range is 41 to 51 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Burlew's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from

being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Burlew attacked an officer trying to protect the Capitol and attempted to pull that officer from the relative safety of the police line into the violent mob. Burlew violence was not directed only at law enforcement; Burlew also attacked a photographer by violently shoving that photographer over a wall. After all of that, he encouraged and assisted in the destruction of part of the inaugural stage. Ultimately, Burlew's early violence helped pave the way for other rioters to overwhelm police and breach the Capitol. The nature and circumstances of Burlew's offense were of the utmost seriousness, and fully support the government's recommended sentence of 51 months' imprisonment.

### B.  The History and Characteristics of the Defendant

Burlew served in the Army for twelve years, including his time in the Army National Guard. Though he was discharged under honorable conditions, his discharge was the result of cocaine use. Burlew was discharged from the Army under the provisions of AR 635-200, Chapter 14, paragraph 14-12c, which authorizes discharge when a soldier commits an act of "serious misconduct," which is an offense that could be punished by punitive discharge under the Uniform Code of Military Justice. The separation memorandum stated, "[c]ontinued presence of this Soldier within the unit is detrimental to good order and discipline."

Burlew was diagnosed with PTSD. In addition, Burlew was evaluated in October 2021 by the Veteran's Administration and, during that evaluation, Burlew minimized his conduct on January 6, claiming "I did not put my hands on anyone." PSR ¶ 84. Though he certainly has some medical issues, the true extent of those issues is unclear: after an independent evaluation, a court-

appointed expert found Burlew to be malingering. PSR ¶ 86. Even if these injuries exist to the full extent reported by Burlew, there is no indication that the Bureau of Prisons cannot handle treatment of Burlew's medical conditions. As such, his medical issues should not affect his sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Burlew's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. The defendant's actions on January 6, 2021 clearly demonstrate a pattern of assaultive and unrepentant behavior. Indeed, Burlew has still not accepted responsibility for his actions, failed to attend two pre-trial hearings leading up to his original trial date, and then submitted affidavits with statements that were disingenuous and not

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

entirely candid. He is unremorseful and unrepentant; such conduct merits a serious term of incarceration.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious,

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Montgomery*, 21-cr-46 (RDM), the Court sentenced the defendant to 37 months' imprisonment and 36 months of supervised release for a 18 U.S.C. § 111(a)(1) conviction following a stipulated bench trial. That defendant grabbed an officer's baton, fought the officer down to the ground to gain control of it, and then kicked the officer. That defendant then entered the Capitol where he went into the Senate Gallery and confronted another officer near Minority Leader Charles Schumer's Office. Montgomery was a Criminal History Category I, and 37 months was in the middle of his Guidelines range of 33 to 41 months of imprisonment. Both Burlew and Montgomery engaged in obstructive conduct—Burlew by making false statements in connection with his motion to withdraw his guilty plea and Montgomery in arguments he made to the court at this stipulated trial, including blaming the officer for the assault. Burlew, however, absconded for a significant period of time where Montgomery did not. Burlew's guideline range is, therefore,

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

appropriately higher.    Moreover, Burlew anticipated political violence as evident in his pre-January 6 video. These aggravating factors set him apart from Montgomery and warrant a term of imprisonment at the high end of his applicable guideline range.

This Court has also sentenced the defendant in *United States v. Miller*, 21-cr-75 (RDM), to 33 months of incarceration and 24 months of supervised release on 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 1512(c)(2) convictions. Miller pled guilty to some of the charges against him. His Criminal History Category was I, and his Guidelines range was 41 to 51 months of imprisonment. Miller's assaultive conduct was more protracted than Burlew's. While inside the Lower West Terrace Tunnel, Miller unleashed the contents of a fire extinguisher onto officers, threw a can of beer and batteries at officers, and encouraged rioters to push against police. Whereas Miller admitted guilt and took responsibility for his, Burlew absconded, pled guilty, and then made misleading statements to the Court in an attempt to vacate his plea.[7]

---

[7] This Court has also sentenced the defendant in *United States v. Cua*, 21-cr-107 (RDM), to 12 months and 1 day of incarceration and 36 months of supervised release on 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 1512(c)(2) convictions. Cua was convicted following a stipulated bench trial. His Criminal History Category was I, and his Guidelines range was 27 to 33 months of imprisonment. Cua's conduct included entering the Capitol via the Upper West Terrace Door and assaulting an officer by shoving him repeatedly, that allowed rioters to enter the Senate Gallery. The Court should sentence Burlew to a substantially higher sentence than it sentenced Cua for multiple reasons. First, Burlew's assaultive conduct was more egregious than Cua's. Burlew dove at Officer O.F., grabbed him with both arms, and tried to pull him into the violent mob. Second, Burlew committed an additional assault by pursuing and violently shoving a member of the media. Third, the Court varied downward in imposing Cua's sentence because of Cua's youthful age at the time of the offense; he was eighteen years old. Fourth, the Court credited Cua's expression of remorse. None of those mitigators exist here. In fact, the opposite is true: there exist multiple aggravators that warrant a more serious sentence.

In *United States v. Fairlamb*, 21-cr-120 (RCL), the court sentenced the defendant to 41 months of imprisonment and 36 months of supervised release on a plea to 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1). Fairlamb yelled at officers on Capitol grounds, took a police baton that an officer had dropped, and assaulted an officer by shoving the officer, sticking his finger in the officer's face, and punching the officer's face shield. Fairlamb also committed obstructive conduct by deleting videos from Facebook. Both Burlew and Fairlamb used a combination of aggressive language and physical assault in their confrontations with police. Fairlamb's Criminal History Category was I, and 41 months was the low end of his Guidelines range of 41 to 51 months of imprisonment. Burlew's conduct warrants a higher sentence. Burlew committed multiple assaults, one against a police officer and one against a member of the media. On the other hand, Fairlamb appeared for his court hearings, was one of the *first* defendants to plead guilty to a § 111 stemming from the riot, did not provide misleading information to the Court while seeking to withdraw from his plea agreement, and did not frivolously deny relevant conduct. As such, a sentence at the high end of the Guidelines range is appropriate for Burlew in comparison.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer O.F., did not suffer bodily injury as a result of Burlew's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Burlew must pay $2,000 in restitution, which reflects in part the role Burlew played in the riot on January 6.[9] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Burlew's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 126.

---

18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.    FINE

Burlew's convictions for violation of 18 U.S.C. § 111(a)(1) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Burlew did not provide documentation of his finances to pre-trial services and, though he has retained counsel, it is unknown how he is paying for his legal services. PSR ¶ 97. Based upon statements made by defense counsel, the government understands that he is representing Burlew *pro bono*. Burlew's wife reported that the couple has had no taxable income since 2019, but did not provide copies of Burlew's tax returns. PSR ¶ 101. Burlew owns his home in Oklahoma, and does not have a mortgage on the property. PSR ¶¶ 99-100. As the revised PSR notes, and looking most recently at his Give Send Go page, Burlew has raised over $8,000 in an online campaign created by his wife. PSR ¶ 102 ("The defendant maintains an active GiveSendGo account, entitled, "Family Relief Amidst J6 Persecution."). Probation concluded that it does not appear that Burlew has an ability to pay a fine, though this conclusion appears to be based on unverified information

reported by Burlew and his wife. PSR ¶ 103. As such, Burlew has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $15,000-$150,000. U.S.S.G. § 5E1.2(c).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 51 months' imprisonment, three years' supervised release, $2,000 in restitution, and a mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    */s/ Anna Z. Krasinski*
ANNA Z. KRASINSKI
Assistant United States Attorney
New Hampshire Bar No. 276778
United States Attorney's Office
Detailed from the District of New Hampshire
(603) 451-7851
anna.krasinski@usdoj.gov

*/s/ Jennifer Leigh Blackwell*
Jennifer Leigh Blackwell
Assistant United States Attorney
D.C. Bar No. 481097
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 803-1590
jennifer.blackwell3@usdoj.gov